UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY PETTY,

    *Plaintiff*,                                         Case Number: 13-cv-13324
                                                                  Honorable Victoria A. Roberts

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

    *Defendant.*
_____/

# ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 13) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 11)

## I. INTRODUCTION

This matter is before the Court on cross-motions for summary judgment by Plaintiff, Terry Petty, and Defendant, the Acting Commissioner of Social Security, Carolyn Colvin ("Commissioner"). Petty appeals the Commissioner's denial of his application for supplemental security income ("SSI") benefits for an alleged disability.

Because substantial evidence supports the ALJ's decisions, the Court **GRANTS** the Commissioner's Motion for Summary Judgment and **DENIES** Petty's Motion.

## II. BACKGROUND

Petty was twenty-four years old when he filed an application for SSI alleging a lifelong disability. (Tr. 64.) Petty's disability claim revolved primarily around cognitive impairments but also issues with dexterity, obesity, and social-psychological impairments including dysthymia, paranoia, and hyper-vigilance. (*See* Tr. 173-176, 178-179.)

1

### A. Procedural History

Petty filed his application for SSI on November 23, 2010. (Tr. 64.) The Commissioner initially denied Petty's application, and Petty requested an administrative hearing. (Tr. 79.) The hearing took place on October 13, 2011 before Administrative Law Judge Oksana Xenos. (Tr. 26.) Petty, his mother Diana Foster, and an independent vocational expert, Harry Cynowa, testified at the hearing. (*Id.*) On November 7, 2011, the ALJ issued a decision finding Petty not disabled within the meaning of the Social Security Act. (Tr. 23.) On June 5, 2013, the Social Security Administration's Appeals Council denied Petty's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-9.) On August 8, 2013, Petty filed this suit under 42 U.S.C. § 405(g) of the Social Security Act, which provides for judicial review of final decisions by the Commissioner.

### B. Petty's Testimony

Petty testified about his personal history and his attempts to find employment. Petty said he currently lived with both his parents and wife, graduated from high school after repeating the twelfth grade, and had never held a job. (Tr. 47-48.) He claimed that he tried to find a job but felt people would not hire him because of his cognitive impairments. (*See* Tr. 48.) He said he sought help through Michigan Rehabilitation Services but "they wouldn't do anything." (Tr. 49.)

Petty also testified about his daily functioning and social interactions. He said he mostly locks himself in his room and watches television or plays video games. (Tr. 50.) He stated that he used his mother's computer for Facebook but did not have many

friends. (Tr. 50.) He also said that he interacted regularly with one sibling but that they mostly just sat home and talked. (*See* Tr. 50.)

Petty also testified on physical abilities and health issues. He said that he took blood pressure medicine, could only walk a couple of blocks before losing his breath, and had problems with his hands. (Tr. 51-52.) The tasks he could perform included removing snow, picking up leaves, taking the dog for short walks, driving to the grocery store or going on other short trips, and vacuuming. (Tr. 52-54.) However, he said he could not remove snow quickly and generally did few chores or other housework. (*See* Tr. 52-54.)

### C. Diane Foster's Testimony

Foster testified on the tasks Petty could perform, their home life, and her concerns about Petty's future. She said that, if asked, he would do minor chores. (Tr. 55.) She also testified about Petty's social problems. (*See* Tr. 55.) She expressed the opinion that someone would need to look after Petty the rest of his life, in part, because others would take advantage of him. (Tr. 56-57.) She also claimed that Michigan Rehabilitation Services offered no help in finding jobs. (Tr. 57.) On examination by the ALJ, Foster expressed a belief that job training would boost Petty's self-esteem but that the economy did not make it possible for him to receive this training. (Tr. 58.)

### D. Testimony by the Vocational Expert

The ALJ asked vocational expert Cynowa about job opportunities in the regional and national labor market. (Tr. 59-60.) She posed two hypotheticals to Cynowa that reflected different residual functional capacities and profiles. (Tr. 60.) First, she asked whether a person of Petty's age at the time of application with "a high school education and no past work experience, who can perform work at all exertional levels but is limited, to

3

unskilled, routine, simple repetitive, non-production oriented, self-paced work, involving one to two-step instructions, occasional contact with the general public, coworkers and supervisors, and minimal changes in work setting," could find employment. (Tr. 60.) Cynowa replied that there would be a wide range of unskilled work. (Tr. 60.) He brought up the positions of hand packager, which had the Dictionary of Occupational Titles' ("DOT") number 559.687-074, and small products assembler, which had the DOT number 706.684-022. (Tr. 60.) Cynowa stated that 2,500 positions locally and 100,000 nationally existed for both jobs. (Tr. 60.)

Next, the ALJ modified the question to include that "due to cognitive impairments and a combination of other impairments, the individual would be off task up to 20 percent of the work day and could not sustain the concentration, persistence, or pace necessary to complete an eight-hour workday, five days a week on a regular and continuing basis." (Tr. 60). Cynowa said there would be no competitive full-time employment for an individual with that profile. (Tr. 60.)

**E. Opinion Evidence**

Both the ALJ's decision and Petty's challenge rely on the opinion evidence offered by Dr. Richard Gelb and Dr. Matthew Rushlau. Dr. Gelb evaluated Petty on October 10, 2010 at the request of Michigan Rehabilitative Services. (Tr. 180-187.) Dr. Rushlau reviewed Petty's records, including Dr. Gelb's evaluation, on behalf of the Social Security Administration. (Tr. 63-73.) Their findings are discussed in relation to the motions.

4

## III. STANDARD OF REVIEW

The Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citations omitted). Substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted). The standard presupposes "there is a zone of choice where a decision maker can go either way" and the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Davis v. Apfel*, 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001) (internal quotations and citations omitted). The Court must affirm the decision if substantial evidence supports it, even if it would have decided the matter differently. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted). If the Court determines that substantial evidence exists, the inquiry does not go further to see if it equally supports another determination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

## IV. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

A claimant will be considered disabled within the meaning of the Social Security Act if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The regulations provide a five-step procedure for evaluating disability within this definition. 20 C.F.R. § 416.920(a)(4). Summarized, the regulations provide that:

1. If claimant is doing substantial gainful activity, he is not disabled.
2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. §§ 404.1520, 416.920. "[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Walters*, 127 F.3d at 529.

At step one, the ALJ found that Petty had not engaged in substantial gainful activity. (Tr. 28.) At step two, she found that Petty had a severe cognitive impairment and non-severe impairments of obesity and hypertension. (Tr. 28.) At step three, the ALJ concluded that Petty did not meet any listed impairment but had mild restrictions in the activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace. (Tr. 29-31.) Between steps three and four, the ALJ determined that Petty had the residual capacity to "perform a limited range of work at all exertion levels". (Tr. 37.) But in light of his cognitive impairment, she added a "restriction to unskilled, simple, repetitive work involving no more than one or

6

two steps, with no production expectations, the opportunity for self-pacing, and minimal work places changes" (Tr. 37.) She also accommodated his difficulties in "social settings . . . by the restriction to only occasional contact with the general public, co-workers and supervisors." (Tr. 37.) At step four, Petty had no past relevant work for the ALJ to assess. (Tr. 37.) At step five, the ALJ determined that sufficient jobs existed in the national economy for someone with Petty's age, education, work experience, and residual functioning capacity. (Tr. 38.) She found, in obvious reference to vocational expert Cynowa's statements, that an individual with these limitations could perform unskilled jobs such as "hand packager" and "small products assembler." (Tr. 38.)

## V. ANALYSIS

Petty argues that: (1) the ALJ improperly weighed the opinion evidence offered by Dr. Gelb and Dr. Rushlau; (2) substantial evidence did not support the ALJ's determination of Petty's residual functioning capacity; and, (3) substantial evidence did not support the ALJ's decision that Petty did meet the disability listing of § 12.05(D). The ALJ's conclusions, even considering what detracts from them, were supported by substantial evidence. Furthermore, Petty's arguments are only perfunctory.

**A. Petty Fails to Show an Error in the ALJ's Weighing of Opinion Evidence.**

Petty argues that the ALJ improperly weighed the opinion of Dr. Rushlau over Dr. Gelb. However, the record indicates that both Dr. Rushlau and the ALJ reasonably incorporated and interpreted Dr. Gelb's findings in relation to the rest of the record.

In making disability determinations, the ALJ will generally give more "weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(c)(1). Also, the "more a medical source presents

7

relevant evidence to support an opinion" and the "better an explanation" a source provides, the more weight it will be given." 20 C.F.R. § 404.1527(c)(2). The weight of nonexamining sources' opinions depends "on the degree to which they provide supporting explanations of their opinion." *Id.* Consistency matters to the weight an opinion source receives and "the more consistent an opinion is with the record as a whole, the more weight" it will receive. 20 C.F.R. § 404.1527(c)(4). The ALJ must consider the findings and opinion of state agency doctors; the regulations deem these doctors "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §416.927(e)(2)(i).

Petty believes Dr. Rushlau and Dr. Gelb disagree on Petty's deficits and that Dr. Gelb must be given the most weight because Dr. Rushlau is not an examiner, Dr. Rushlau did not provide a consistent rationale in finding only moderate limitations, and Dr. Gelb's analysis was more relevant to Petty's employment prospects. But Petty does not move beyond stating a disagreement exists, and he misconstrues Dr. Rushlau's report.

Petty makes no explicit attempt to substantially compare the two doctors' findings; instead, he just states generally that they conflict. Petty also claims that Dr. Rushlau views Petty's deficits as "insubstantial."  Dr. Rushlau's report states that Petty "has not experienced substantial loss with regards to his ability to understand, carry out and remember simple instructions; make simple work-related judgments and decisions; respond appropriately to supervision, coworkers and work situations; and deal with changes in a routine work setting." (Tr. 69.) Petty does seem to juxtapose, in presenting the "facts," Dr. Rushlau's quoted language above with two of Dr. Gelb's statements.

First, that Petty "will likely require closer attention/monitoring to make sure he is doing what is asked correct, make sure his choices/decision making and attention to safety is appropriate, and is beginning following through with job tasks." (Tr. 184.) (errors contained in original) And second that Petty "will likely only be able to learn tasks which are routine, repetitive, and can be done at a slow pace and, as mentioned above he shows significant impairment in performing simple manual tasks at a reasonable pace." (Tr. 185.) But his analysis does not provide any substantial analysis for his argument that the ALJ or Dr. Rushlau failed to account for Dr. Gelb's findings.

The Commissioner responds that Petty mischaracterized Dr. Rushlau's findings. The Commissioner notes that Dr. Rushlau found Petty "had not experienced substantial loss with regards to his ability to understand, carry out, and remember simple instructions," which simply means that Petty could perform unskilled work. (Tr. 69.) The Commissioner argues this is not the same as saying Petty's deficits generally were "insubstantial" and notes the many limitations Dr. Rushlau found on Petty's abilities.

The Court agrees with the Commissioner. At best, Petty only highlights that Dr. Rushlau and the ALJ could have interpreted Dr. Gelb's findings as providing more stringent limitations. He does not demonstrate that the ALJ rejected a particular part of Dr. Gelb's findings that necessarily conflicted with Dr. Rushlau's. Dr. Rushlau cited to the finding of facts which shows, essentially, that Dr. Rushlau reviewed information indicating limitations but reasonably determined that Petty could still perform simple, unskilled work. He based this finding on Petty's different Global Assessment Functioning scores, earlier IQ and functioning scores, earlier descriptions of Petty's impairments, and different descriptions of Petty's employment outlook and activities. (Tr.

9

67.) Both the ALJ and Dr. Rushlau interpreted Dr. Gelb's findings in this framework as providing many limitations of what Petty could do. (*See* Tr. 70-71.) Dr. Gelb's report finds that Petty would need to do only "routine, repetitive tasks;" however, it does not demand a finding that Petty has suffered a substantial loss in the ability to follow simple instructions or respond appropriately in simple situations.

Petty demands a different interpretation of Dr. Gelb's report and that it receive priority over all other information. However, the ALJ reasonably views both Dr. Gelb and Dr. Rushlau as describing many limitations on Petty's abilities while Dr. Rushlau's review of the record affirms the boundaries of those limitations. The ALJ did not err in weighing the evidence; to find otherwise would be to substitute this Court's judgment for a reasonable decision by the ALJ on how much weight to give each source.

**B. The ALJ's Residual Functioning Capacity Finding is Supported by Substantial Evidence and Reflects the Limitations Petty Wants to Add.**

Petty argues that the ALJ's Residual Functioning Capacity finding ("RFC") should have included stronger and different limitations. However, the record shows that the RFC sufficiently addressed these limitations and, overall, was supported by substantial evidence.

After step three, the ALJ must make a determination on the "residual functional capacity" of the claimant based on "all relevant medical and other evidence." 20 C.F.R. § 416.920(e). At the fifth step, the ALJ uses this assessment to determine if the claimant can "adjust to other work." *Id.* Making a determination on the ability to adjust to other work requires considering the claimant's residual capacity along with the "vocational factors" (age, education, and work experience) provided in the regulation. 20 C.F.R. §

10

416.920(f). If the claimant can perform other work, he will not be found disabled; if he cannot perform other work, he will be found disabled. *Id.*

The ALJ's RFC stated that Petty could perform unskilled, routine, simple, repetitive, non-production oriented, self-paced work involving one- to two- step instructions with only minimal changes in the work setting and only occasional contact with the general public, coworkers, and supervisors. (Tr. 32.) Petty claims this is inadequate for three reasons: (1) the ALJ did not consider his issues with processing speed and dexterity, and should have restricted jobs that require "handling" or "manipulation"; (2) the ALJ's RFC and, presumably the hypothetical posed to Cynowa, did not account for his lack of social skills because it allowed for occasional contact with supervisors, co-workers, and the public; and, (3) the RFC ignored the need for "on the job" support and should contain a provision for a job coach or extra oversight.

Petty's first challenge fails because the ALJ specifically included that the work be simple, "self-paced" and "non-production oriented" due to the processing speed and dexterity issues raised in Dr. Gelb's report. (Tr. 36-37.) Within the relevant definitions provided by the Dictionary of Occupational Titles, "handling" requires, in part, using "body members, hand tools and/or special devices to work, move, or carry objects and materials" involving "little or no latitude for judgment with regard to attainment of standards or in selecting appropriate tool, object, or materials"; "manipulating" is defined as "using body members, tools or special devices to work, move, guide or place objects and materials." (Ex. 1.) The scale provided by the Dictionary of Occupational Titles, "0" represents the hardest task within the relevant category and" 7" represents the simplest; manipulating ranks as "4" on this scale and handling as a "7." Looking at the relatively

minor demands on dexterity, Petty's processing speed and dexterity issues do not necessarily or even strongly favor a limitation on these factors. Dr. Gelb's findings support that Petty has the most difficulty with the pace at which any manipulating or handling could be done. Many things on the record, including Petty's simple meal preparation and other activities, show that "moving" or "guiding" objects with "body members" is not impossible for him. The ALJ's limitations prevented the inclusion of work demanding a high level of fine motor skills and the self-paced and non-production limitations deal with his pace issues; she considered the major factors, processing speed, and his pace at these tasks, in making her finding.

The ALJ also acknowledged limitations on social functioning in requiring that Petty can have only "occasional contact" with the general public, coworkers, and supervisors. (Tr. 35.) The record does not support a more stringent limitation. Dr. Rushlau opined that Petty could still respond appropriately to supervision, coworkers, and work situations. (Tr. 69.) Dr. Gelb's assessment does express a need for simple social skills lessons but does not demand that Petty have zero contact with coworkers, employers, or others. Also, Petty's mother reported he gets along well with people, is respectful of authority figures, and does chores when prompted. (Tr. 181.) The evidence indicates trouble with social interaction but allows a reasonable mind to find the ALJ's limitation to only occasional contact with others is sufficient.

Dr. Gelb's finding that claimant may need more training or supervision is mentioned by the ALJ in her decision on his limitations. The limitation to "one- to two- step" instructions and the requirement that the work be "routine" and "simple" relates directly to his cognitive abilities. Dr. Gelb's comments on social skills education and supervision

12

support the idea that a "job coach" or specific "extra oversight" might be beneficial. But the ALJ's decision found support in Dr. Rushlau's review of the record and the variety of tasks Petty already performs. (Tr. 34-35)

This Court finds that substantial evidence supports the ALJ's RFC; the RFC addresses the issues Petty raises and the record only shows that, at best, a zone of choice might have existed concerning the degree of Petty's limitations.

### C. The ALJ's Determination that Petty is not Disabled under 20 C.F.R. § 404 app. 1 Subpart P § 12.05(D) is Supported by Substantial Evidence.

Petty challenges the ALJ's findings that his difficulties in two categories, (a) "social functioning" and (b) "concentration, persistence, or pace," were only "moderate" rather than "marked" under §12.05(D) of the listings provided in 20 C.F.R. § 404 app. 1 Subpart P. The Commissioner argues this section of Petty's challenge is so inadequately briefed that it should be considered waived. Even considering Petty's claims, the record indicates that substantial evidence supported the ALJ's decision on, at least, the finding of moderate social functioning. Thus, substantial evidence supports her decision that Petty did not meet his burden under § 12.05(D) to show the required IQ along with two "marked" impairments.

In the sequential disability determination, step three provides that if a claimant has an impairment "that meets or equals one of [the] listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement," the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(iii). If, at step three, the impairment "does not meet or equal" any listing, such as § 12.05(D), the ALJ will not find a disability at that point and must continue the analysis. 20 C.F.R. § 416.920(e). The listing Perry uses for his challenge, § 12.05(D), says that a claimant will be considered disabled if he has:

13

> A valid verbal, performance or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Under the rules, the ALJ must apply a rating standard that defines "marked" to mean "more than moderate, but less than extreme." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C). There is no set number of activities or degree of interference a limitation must show, but if it seriously interferes with the "ability to function independently, appropriately, effectively, and on a sustained basis" it will be considered "marked." *Id.*

This regulation also provides the definition of social functioning. 20 C.F.R. § 404 app. 1 § 12.00 (C)(2). Social functioning includes "the ability to get along with others, such as family members, friends," and others such as "grocery clerks" and "bus drivers." *Id.* Impaired social functioning can be illustrated by confrontations or by avoidance and isolation, whereas strength is illustrated through clear communication, initiating contact and responding to authority. *See id.* Having a "marked" limitation in this area is not defined "by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree." *Id.*

The regulation also provides for the definition of concentration, persistence or pace. 20 C.F.R. § 404 app. 1 § 12.00 (C)(3). It is the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* A finding of "marked" limitation is not based off the "number of tasks" one completes "but by the nature and overall degree of interference with function." *Id.* Even if a claimant "can complete many

simple tasks," he can still have "a marked limitation" if he needs supervision to complete the tasks, cannot be accurate, or cannot finish without undue interruptions or rest periods. *See id.*

Arguments that never develop, including in disability appeals or objections to an R&R, can be considered waived. The Commissioner notes it is "well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (internal quotations and citations omitted); *see Lawson v. Comm'r of Soc. Sec.*, 13-CV-11082, 2014 WL 414143 (E.D. Mich. Feb. 4, 2014) (saying that Plaintiff waived arguments for failing to brief with sufficient specificity but then still pursuing analysis as if he had briefed); *Fielder v. Comm'r of Soc. Sec.*, 13-10325, 2014 WL 1207865 (E.D. Mich. Mar. 24, 2014) (dismissing one of Plaintiff's objections to the magistrate's R&R that recommended ruling against Plaintiff's summary judgment motion because the underlying motion presented only conclusory arguments) (slip copy).

Petty argues that the ALJ's decision on § 12.05(D) is not supported by substantial evidence in only two sentences. First, he says that "the ALJ's finding that he did not meet § 12.05(D) at this third step was not backed by substantial evidence." Petty then says that Dr. Gelb's report shows he has "the requisite IQ between 60-70 as provided by § 12.05(D), as well as meets requirements 2 and 3 of § 12.05(D) because the report shows that "he has marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace respectively." (*Id.*)

This is all he says. He cites, as the Commissioner noted, only to Dr. Gelb's findings generally. Petty does not set any standard by which to judge Dr. Gelb's report to show

that it reveals Petty's impairments to be "marked" rather than moderate.

The "facts" section of his brief does highlight some passages that support an argument without linking them in any coherent way to his analysis. For example, he notes comments by Dr. Gelb that Petty "will likely require closer attention/monitoring to make sure he is doing what is asked correct, make sure his choices/decision making and attention to safety is appropriate, and is beginning and carrying through with job tasks." (Tr. 184.) (errors in original) He also mentions Dr. Gelb's comments that Petty "will likely only be able to learn tasks which are routine, repetitive, and can be done at a very slow pace, and . . . he shows significant impairment in performing simple manual tasks at a reasonable pace."

Petty has essentially waived this argument by failing to develop it. But, even an analysis shows that the ALJ's decision is supported by substantial evidence on, at least, the issue of social functioning.

In relation to social functioning, the ALJ reasoned that the claimant had only moderate impairments. (Tr. 30-31.) Dr. Gelb's report does provide reasons to find limitations on Petty's social functioning. (*See* Tr. 180-187.) Dr. Gelb concluded that discomfort and fears of others would make it challenging for Petty in the work place and that he would need a job where minimal interactions with others were expected. (Tr. 187.) He also found that Petty needed "simple social skill lessons" and "lessons to help prepare him so that he does not allow others to take advantage of him." (Tr. 186.) He also noted that interpersonal communication and sociability were "far below average for this gentleman" and that this related, in part, to the feeling people were talking about him due to his weight. (Tr. 184.)

16

Petty's record provides support for restrictions but the ALJ considered other factors in the regulations such as his relationship to family members, ability to get along with others, and the lack of aggravating factors, such as altercations, to support her decision. (*See* Tr. 30-31.) The ALJ interpreted and incorporated the limitations expressed by Dr. Gelb in her finding along with aspects of his report that supported positive social functioning. Dr. Gelb, in addition to discussing limitations, also stated that Petty's temper and impulse control were average, that Petty was pleasant and cooperative, and that Petty's mother said he has a respectful attitude towards authority. (Tr. 181-182,184.) Considering the multi-factor, holistic approach in determining "marked" vs. "moderate" restrictions, substantial evidence supports the ALJ's interpretation of Dr. Gelb's findings as endorsing a moderate limitation.

Because the ALJ's decision on social functioning was supported by substantial evidence, the Court does not need to consider issues of concentration, persistence, or pace; Petty fails to establish the presence of marked limitations in two categories under § 12.05(D), and thus fails to establish disability.

## VI. CONCLUSION

The Court **GRANTS** the Commissioner's Motion for Summary Judgment and **DENIES** Petty's Motion for Summary Judgment. The Commissioner's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

S/Victoria A. Roberts<br>United States District Judge

Dated: July 30, 2014